Thank you. Thank you. All right. Our third case for this morning is Elizabeth Ruckelshaus v. Gerald Cowan and others. And we will begin with Mr. Nice.  May it please the Court. My name is Robert Nice and I represent the appellant Elizabeth Ruckelshaus in this matter. Why do we have a statute of limitations? The law tells us it's to promote diligent prosecution of known claims and to avoid faded memories, lost evidence, or an absence of witnesses. Why do we have a discovery rule? To promote fairness and to avoid claim preclusion before the claim is even known. Legal malpractice actions are subject to the discovery rule. The statute of limitation in this case did not begin to run until such time as the plaintiff knew or in the exercise of ordinary diligence could have discovered that she had sustained an injury. There is no statute of limitations. Mr. Nice, let me ask you kind of an opening question here. The retention letter with Emswiller, which is, if I'm not mistaken, December 1998, simply says the purpose of this engagement is to achieve the termination of your father's revocable trust. Well, to me, the word termination connotes exactly what happened. The trust was wrapped up, the assets were distributed. I don't see anything in that retention letter about modification of the trust about reallocating responsibilities between the two siblings. And so even as early as that, it seems that there's a red flag that's not in complex legalese or anything, the termination. And then looking at the Marion Superior Court order, which does exactly that, this court should terminate the trust, that's what the court order does. Again, not saying a word about anything else, and the settlement agreement doesn't either. So I'm hard-pressed to understand why Ms. Ruckelshaus is not on notice, let's say by 2000, that this is not going the way she expected. It's a very easy answer, Your Honor, and that is the first answer, the first question is found in the affidavit of, supplemental affidavit of Rodney Ressner, which says that a letter of retention starts out the representation, but things evolve as you learn more about the case and the client's needs and desires. Secondly, we have the email from Ken Emsweiler that absolutely demonstrates that he knew of this arrangement. And if he knew it five minutes before he filed the documents to terminate the trust, he had an obligation, as also set forth in the affidavit, I believe in paragraph 15, a rescue affidavit, he had an obligation to acknowledge that he was in a conflict because he represented both Bettina and her brother. And it was easy enough. The problem here is when we look at things like the Scheidler case and the Ickes case, they talk about documents that were created. The problem here is that they never created the document that should have been created, which is the trust, a second trust, a new trust for Tom, and that should have been done before the termination of the trust and pursuant to Mr. Ressner's affidavit. If that had been done, people would have language. Mr. Neese, you're arguing the merits. I mean, as Chief Judge Wood pointed out, really the problem here is the statute of limitations, and let's assume that the lawyers did breach their obligations and let's assume that the trust should have said what she says she intended it should have said to create this life estate for Polly. Why shouldn't she have known that at the time, either when she reviewed the trust agreements in the very beginning or even at his death? You know, this was a long time after Polly died. The answer to that is, Bettina testified, it was my understanding that what I had asked to have done was done. If it was done right, the terms of that deal would not be in the trust-breaking documents, and that would not be in a document that Bettina had to sign. So the question becomes it's an omission versus a commission. What is reasonable is a factual question. Was it reasonable for her to believe that because she asked for this to be done, because he did not say anything else to her or raise the issue with her, that she has to be her own lawyer? That's a factual question. Mr. Nisla, it's Judge Scudder. The difficulty that I have with that argument is, by its terms, the settlement agreement, I think this is what Judge Wood is getting at, the settlement agreement affects a final distribution of the trust property. And it just, I don't understand an argument that I had a $1 million, potentially $1 billion reversionary interest that may come to me, and the final settlement agreement that deals with 100% of the trust assets is altogether silent on the reversionary interest. And if we're applying the discovery rule to when the claim accrued under Indiana law, I don't know how she's not on notice the moment that she reads the settlement agreement. And I just have to say, I share that difficulty. And I guess maybe on the theory that you need to spell things out when $1 million or so are at issue, where is a signal in this conditional settlement agreement that some money was going to be clawed back again from the brother? It would never be in there. If it had been done right, it would never be in there. It would have been a separate document in a trust, and it would never have been mentioned in that document, which was a public document. How do you say that, though, in light of Paragraph 6, which says the agreement represents the full agreement of the parties? It doesn't contemplate a side arrangement. Respectfully, Your Honor, if that trust had been set up in advance, as it should have been done, then there would not have been any further agreements to be completed. The breaking of the trust was the terminal arrangement, because after that, she had lost any leverage she had. Remember, this was a request of Tommy's, not of Bettina's. Tommy never worked a day in his life. Bettina did work and had other means. She did this to accommodate her brother. She asked her attorney to look out for her. He did not do so. But if he had, he would have recalled this by creating a trust for Tommy or discussing it with her. And that's what Rodney Retzner says is the standard of care. And if he had done that, she wouldn't have had to see anything about that in the settlement document. So your view is that she's not on notice at all from Paragraph 2 of the settlement agreement that specifies the distribution of the I just can't quite see how undoing that doesn't say anything about creating a different trust for Thomas. It doesn't in any way hint that there's a qualification on his, on the interest that he receives. And you keep saying, well, it wouldn't have been in this document, but I'm not so sure about that. Well, your Honor, if we go back to the Hildebrand case where chief judge Barker reviews this area of the law and cited in our brief, she goes through a very nice discussion. And one of those points is that in, when there is a fiduciary relationship, such as between attorney client, there is a duty to speak. And that's what makes the difference here. But what's so obviously bad about this? I mean, each one of them gets a million dollars, give or take free and clear. They can invest it however they want to. They can manage it. They can spend it. They can do whatever they want to. And maybe some people would rather have the million dollars to invest themselves as opposed to having just an income interest in a trust. This doesn't strike me as an unconscionable agreement on its face. I'm not saying it's unconscionable. I'm saying that it is inadequate because of what he did not do. The fact that she got a substantial economic benefit is only step one. He got the second step correct, but he missed the first step. And so. But why is there nothing in this agreement about a need to account for how he's using the million dollars that he gets a need to specify how much is invested and how much interest is throwing off and how much is going to go to Polly. There's a lot that's not there. Understood your honor. But as far as if you're getting to the issue of calculating damages, it didn't need to be there. All we need to know, our expert, our economic expert calculated that if you take the value of the disbursement and bring it forth the present value as the time of Polly's death, that that number is greater than the amount left in Polly's estate at the time of her death, which means they consumed everything else they had, but for this trust money. And so that's how we get to a measure of damages. And again, it goes to a factual question, but that's the measure. And we have expert testimony on that issue. He talks about a number of distractions in the brief. I just want to generally address those in terms of Gordon Wisher's involvement. They have made a suggestion that he was her private counsel. This testimony shows that you simply refer over to them, but if they pursue that as a non-party, as they've named him, isn't that the definition of a factual question as to whether she received any advice or lack of advice from him. He was at fault about the same goes for bill Tucker in South Carolina. They have refused to take any responsibility themselves, even though they were hired to do this. And again, I would ask the court to focus on the affidavits of Rodney Retzner, which shows should have had, what should have happened. He has incredible credentials. They have acknowledged that he is a qualified expert and he's sets forth to the court. What should have happened the moment Mr. Emerson recognized there was a conflict and there's nothing to be argued about that. They spend time in their brief talking as if maybe this agreement never happened yet. We have an email from him that demonstrates he knew about this prior to filing it. And as soon as he knew he was in a conflict and had a duty to speak and he didn't do it. And he shouldn't get a pass because he didn't speak then in terms of now asserting the statute of limitations. She had no reason to know about this until the time of Polly's death, because that is when she expected there would be money left over. What about when, when Thomas's will was probated? The will wouldn't tell you anything because the will would not have that information in it. Again, if you'd set up a trust, the trust is private. That document would, would not be of any benefit in terms of giving any notice. No reason. And she had no expectation of getting anything from as well because he expected to go to Polly. She expected to go to Polly. So there would be nothing inconsistent about that from what her original expectation was. It's the description of what goes to Polly. That would be of interest, not does something go to Polly? She would have, as you say, have expected under her arrangement, but free and clear ownership of, of an estate versus some kind of conditional interest to life estate and income or something of this sort would be different. Anyway, if you'd like to save a little bit of time for rebuttal, this is the time. Okay. Thank you. Mr. Calamaros. Morning. Thank you. I think you've hit on the critical things here is, is that we have a series of dates between December of 1998 and Thomas and the end of Thomas's estate being closed where in the exercise of ordinary diligence, Ms. Ms. Ms. Ruckelshaus could see that, that what she hired Mr. Amesweiler, Mr. Cone to do, if it was something other than the retaining agreement, the, the documents that were sent to her that she had for over a year between her and Mr. Wishard, the way the documents were probated through when she met with her brother and, and the estate planning attorney and learned that he had no will, that he had taken no action. He had signed nothing. When he signed his will in December, when he died in July of what was it? 2009. There are ordinary diligence is not the, the ostrich method when it comes to this much money. And these activities and all along the way, if we're lawyers and we, we use a separate retaining agreement every time, and that's the undisputed testimony when it comes to my client. And when my client was told that there was an oral agreement, he wasn't asked to do anything about it. So, excuse me, excuse me, Mr. Como. So is it your position that if there were a later understanding between Ms. Ruckelshaus and Mr. Emsweiler, there would have been a supplementary letter saying, and we will help you draft a trust for your brother to promise, to give some of the money back. Why, why would it be her job to do her brother's trust? Well, it wouldn't be her job, but the testimony again, undisputed is my client said he would never do anything. If you even go to the complaint, they allege that my client told Thomas that he wasn't going to do as a state because he wasn't a Montana lawyer. My client identified very specifically what they were going to do and why there would be no conflict. And also what, what else could happen? Well, it's entirely possible. Something else could have happened under someone else's hand and judge. That's, I think the important thing we're allowed limited representation. This is a, this is a circumstance where these two people had equal interests at the beginning. And of my client's representation and equal interests at the end. And that didn't prevent either of them from having other lawyers do other things. And if you look at her own email, it was her belief in, in the email to my client at the very end, when she went to hire my client, the third time it's very clear, she said it was supposed to be in my brother's will and trust. She never, she never contemplated or expected this to be in the original document, even though in their complaint, that's sort of what's alleged the point here is, is that, that if there was something else that was supposed to, supposed to be done by my client, that there would be some evidence, you know, the, and when we talk about the experts, you know, we had a, again, summary judgment supported for any other reason in the record, there's extensive argument about whether either of their experts have admissible testimony. And also whether or not we even have real evidence of this alleged promise by Thomas. I mean, So, so can I just come through and say, it's your position that if there was no follow-up agreement or a new trust or some document showing that Holly was going to get only the life interest, a lawyer from someone, it wasn't your client's job. A lawyer from some other place would have had to do that. Absolutely. So he didn't commit in your view malpractice. Oh, I'm sorry. Good. I was just going to say, he did his failure to embody that either in the conditional settlement settlement agreement, which everybody seems to think would not have covered this or in any other document was not malpractice. It was just outside the scope of representation. That's one of the things I think that a document could have been crafted to do this. And the other thing judges, this document that the settlement agreement did allow for written modifications by the parties, but at the end of this document, at the end of my client's representation in 2000, his work was done. And, and, and again, this is, this is not something he undertook to do for Thomas. He never undertook to do it for Ms. Ruckelshaus. He was not licensed to do the kind of work that they want to do. If they were going to do those in the other States. And as you pointed out, there's no question that Thomas's will and his, and his, and his testamentary trust are all we're all spread of record. They were all available to read. And Mrs. Ms. Ruckelshaus even says, as soon as I read that, I knew I wasn't included. So what Mr. Nice says about, Oh no, it wouldn't have been here. Or Oh no, it wouldn't have been there. There was, there was, there were 16. I'm sorry. At least 10 years of opportunity. And documents to see that, that what she now says. She won. Which again, she is. When I was taught, I got to use Ipsa Dixit in talking about the objections to the, to the experts opinions, but it also applies to this very promise. The only evidence of this promise comes from Ms. Ruckelshaus. Thomas didn't write it down. He didn't tell anybody. I asked everybody. My own client said, no, he didn't tell me. 100% of this, the existence of the promise itself. Only comes from Ms. Ruckelshaus, which don't, we have to assume at least that that promise was made. I think I thought this case was really about whether she followed up on it in a sense in time or whether she waited too long. Part of the summary judgment. I said, there's no indication that, that there's any admissible evidence of the promise. That's part of my, another part of my summary judgment. Focusing directly on the statute of limitations, the district court said, we're going to presume this promise was made. And I, I don't think you can presume what, with something doesn't exist from admissible evidence, but even then, again, ordinary. Well, ordinary. Uh, um, diligence, ordinary thinking. Ms. Ruckelshaus was a college graduate. She made in our record. We made clear. She made lots of changes to her own estate planning documents. She went with her brother to set up his estate planning documents, which is.    And I think that's. In my, is one of the great opportunities for her. What? To learn that no documents existed prior. Think about that. If, if, if what Mr. Nice says is there was supposed to be something else. And it really involved Mr. Thomas and, and Bettina shouldn't have had anything to do with that. And I think that's a great opportunity for her to learn that. And I think that's a great opportunity for her to learn that. When Ms. Ruckelshaus went. With her brother in 2008 and met with her brother's attorney who said. We don't have any. We have no, he has no will. He has no trust. He has no documents. At that moment in ordinary conversation, she would have learned that nothing had happened. That she now says she expected to happen in 2000. I, I, I don't. I don't know. I don't know. I think that this is one of those great cases that say, why do we have a statute of limitations is because. Candidly, if, if Gordon Wishard hadn't. Follow Gordon Wishard had followed the destruction practices for his law firm. Most of these documents I would have never found because my client's file was destroyed. My client's file was destroyed.    My client's file was destroyed. My client's file was destroyed. The only, the only documents my client had in his file, when Bettina came the third time for representation. Were those that she sent him. So Gordon Wishard lucky for my clients kept his file, his file that showed she talked to him regularly about these things. That he got copies of all these drafts that she discussed them with. She testified even those drafts she gave to him. So, so there was so much involvement that had. This had this occurred in 2002, 2004, 2006, 2008. We would have had those very witnesses and papers and testimony. But, but this is why we have summary judge. Or statute of limitations like this, the only person who's still alive with all of this knowledge about this supposed truck agreement is Ms. Ruckelshaus, who is the person who says she should have benefited from. These, these, these documents that we have, we, the things that we have are very clear as to this scope. We have to disregard all of the paperwork in order to get to what to, to between his email that says, Oh, I want this to happen. Her own, her own language explains what happened. I'm sorry she was betrayed by her brother. If they had this promise, I'm sorry, she was betrayed by her sister-in-law. But my client wasn't hired to do that work. And, and I, I went in length at the time of summary judgment to talk about the inadmissibility of the expert testimony that they have proffered. They're their own, their economist who says I made these opinions about how much damage is very specifically in his deposition. He says anything. I didn't know the number two. I put a zero in my calculation. Well, that's all. I understand that there may be some problems with that. I think focusing on the issues before us, it's just the fact that Indiana, like most States, I would say, does not have the statute of limitations run only from the moment when there's perfect actual knowledge. The Indiana rule also looks at whether the plaintiff in the exercise of ordinary diligence could have discovered the injury and you don't even necessarily have to know the full extent of the injury. So, so that's our issue. Was there enough going on out there that she should have discovered using ordinary diligence that she's been wrong? Judge, I, I, I, I focus on that. What, what about ordinary diligence, right? That's a person like her should with some promptness where the acts and circumstances are out on the table, be on notice that something's not what she wanted. If we expect all people, we enforce mortgage foreclosures, we enforce real estate contracts. We enforce credit agreements that are highly complex documents that often refer to other documents. We enforce those in Indiana as a matter of, of course, this court, the state courts, what we have here are simple documents and we have repeated simple documents that, that in, that in all candor match, they match each other. The representation letter matches the work that was done. The, the, the work that was not done was on the advice of Gordon Wisher. No one's, but, but as far as Conrad specific trust, all the work was done exactly like the retention letter that the, those documents were given to her and to her lawyer. She said in her own deposition, she reviewed them with her personal lawyer that she expected him to say something if there was something out of line. So even if you say Ms. Ruckelshaus didn't have the knowledge to read these documents, which I quite disagree with. She, she had more than one lawyer at hand and available to do that. When, and again, to me, if you really thought there was going to be some other part, then how in the world do you go to this meeting with your brother's lawyer in 2008 and sit down and review his estate planning documents with him and his lawyer and his lawyer said once he would have gladly given her a copy of the will or when he died. And that very document is spread of record. And in reading it, it's quite clear. Even she says, when she read it, she knew she was out of luck. She was mad because she didn't read it until after Polly died. But let's remember that it's not Polly's promise. If it was a promise, it was Thomas's promise. And that's why I think if you, even if you want to give her the maximum benefit of the doubt and run it all the way until not just Thomas dies, but Thomas's estate closes, you're still years and years before you get to this point. And I just, I think this is, this, this is a sad situation if this is what she exactly wanted, but, but the ostrich approach is not ordinary village. There are too many documents that are too easy to read. And she had too much help available to her from other people that she either a did not use or quite candidly, again, when you, when you read her very email, it's hard to, it's hard to reconcile that email with the plaintiff's complaint, because it seems to me she knew from day one, it was all oral. She says that she knows it was oral. So she knows it wasn't written. I don't think there's any genuine issue of material fact. And when we say, well, it's a question of fact, because we use the word ordinary statute limitations using these exact terms are regularly decided by all of these courts. And there is, as the district court said, we can't see any reason not to just apply the law here. And I would ask this court to do the same, not only on the question of summary judgment, but on all the others within issues within the record that support summary judgment. Thank you. All right. Thank you very much, Mr. Calamaros. Anything further, Mr. Nice. Thank you, Your Honor. Let's start with this. Mr. Enzo said the key to the settlement was Thomas and you agreeing to leave each other the assets received in that case. There's an admission that he knew that. Then look at the affidavit paragraph 15 of Rodney Retzner. He will tell you what should have happened. And the bottom line is that Mr. Ellis, whether it should have spoke, he did not remain silent. So if the standard of care was for him to remain for him, for him to speak with something needed to be done and something did need to be done. And Bettina relied upon that because she said, I understood that what I'd asked to have been done was done. If that's what should have handed, if he had filed the standard of care, why is that not within a factual question as to whether she exercised just ordinary diligence in the way she conducted herself? This is a question of fact that should be decided by a jury, not a court, not a judge. And to not do so takes away her constitutional right to a jury trial. We recognize a jury can go either way on these facts. That's not the question of the day. The question is whether she will have that right to present her case to a jury to ask her peers that I act reasonably under the circumstances. Thank you. All right. Thank you very much. Thanks to both counsel. We'll take this case under advisement.